IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CHARLES W. CUNNINGHAM, JR.       :
(AIS #193686)
                                 :
     Plaintiff,
                                 :
vs.                                        CIVIL ACTION 10-00114-CG-M
                                 :
GRANTT CULLIVER, et al.,
                                 :
     Defendants.


REPORT AND RECOMMENDATION

     Plaintiff, an Alabama prison inmate proceeding *pro se* and *in forma pauperis* filed a Complaint under 42 U.S.C. § 1983. This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on Defendants' motions for summary judgment (Docs. 63, 64, 104, 105, 128, 129, 135, 136, 151, 159, 160, 171, 172, 204, 220, 224, and 227) and Plaintiff's responses filed in opposition thereto. (Docs. 75, 76, 147, 157, 207, 208, 209, 210, 211, and 212). For the reasons stated below, it is recommended that Defendants' motions for summary judgment be granted in part and denied in part, as set forth herein.

I.   SUMMARY OF FACTUAL ALLEGATIONS

     From its review of the record, the Court summarizes the parties' allegations which are material to the issues addressed in this Report

1

and Recommendation.[1]  On March 11, 2008, while incarcerated in the

segregation unit at Holman Correctional Facility ("Holman"),

Plaintiff was escorted to sick call screening by Defendants, Sergeant

Penton Ashworth and Officer Joel Broadhead.  (Doc. 1 at 3-4).  When

Plaintiff arrived at the shift commander's office where sick call

screening was being conducted, he saw Defendant, Lieutenant Tyrone

Jenkins, and began complaining to Jenkins that, on March 7, 2008,

Officer Broadhead, Sergeant Ashworth, and Officer Robert Byrd

searched his cell while he was away, and, afterward, some of his

personal property was missing.  (Id. at 4; Doc. 151, att. 1 at 1;

Doc. 129, att. 1 at 1).  Dissatisfied with Jenkins' response to his

complaint, Plaintiff became loud, disruptive, and uncooperative, and

Jenkins ordered Defendant, Officer Charlie Portis, to cancel

Plaintiff's sick call and take him back to his cell.  (Id.; Doc. 1

at 4-5).

     At approximately 5:55 p.m, Officers Portis, Broadhead, and

Alphonso Burroughs began escorting Plaintiff back to his cell.

(Doc. 1 at 5; Doc. 64, att. 3 at 1).  The three officers entered the

---

1 The "facts, as accepted at the summary judgment stage of the
proceedings, may not be the actual facts of the case."  Priester v.
City of Riviera Beach, Fla, 208 F.3d 919, 925 n.3 (11th Cir. 2000)
(citations and internal quotation marks omitted).  Nevertheless,
for summary judgment purposes, the Court's analysis begins with a
description of the facts in the light most favorable to the nonmoving
party.  See McCullough v. Antolini, 559 F.3d 1201, 1202 (11th Cir.
2009).

elevator with Plaintiff, and Plaintiff began cursing and confronted Officer Broadhead about taking his property. (Doc. 1 at 5; Doc. 151, att. 1 at 2). According to Plaintiff, Officer Broadhead responded to his accusations by choking him. (Id.). Officer Broadhead then exited the elevator, and Officers Portis and Burroughs continued to escort Plaintiff to his cell, refusing Plaintiff's demands to be taken to the health care unit. (Id. at 6; Doc. 151, att. 1 at 2). Upon arriving at his cell, Plaintiff refused to allow the officers to remove his handcuffs, insisting that they get a supervisor to come and see him. (Doc. 1 at 6).

As demanded, Defendants, Lieutenant Jenkins, Sergeant Michael Watson, Sergeant Christopher Corbitt, and Sergeant Ashworth came to Plaintiff's cell. (Id. at 7). Plaintiff informed the officers that Officer Broadhead had choked him, and he demanded that the officers him to the health care unit for medical attention. (Id.). The officers refused to obtain medical treatment for Plaintiff, and, in response, Plaintiff refused to allow his handcuffs to be removed. (Id.).

At approximately 6:10 p.m., Defendant, Officer James Sizemore, came to Plaintiff's cell to attempt to persuade him to relinquish his handcuffs before a cell extraction team was formed. (Id.; Doc. 64, att. 7 at 1; Doc. 208 at 15). Plaintiff informed Officer Sizemore

that Officer Broadhead had choked him and that he needed medical attention. (Doc. 1 at 7). Officer Sizemore assured Plaintiff that, if he would relinquish the handcuffs, he would receive medical attention. (Id.). Plaintiff complied, but he did not receive medical attention. (Id.).

A short time later, Sergeant Ashworth, Sergeant Watson, and Officer Broadhead were escorting Nurse Ellen Langford through the segregation unit for pill call. (Id. at 7). Plaintiff became angry when he saw Officer Broadhead. (Doc. 212, att. 1 at 8). When the officers and the nurse approached his cell to give him his medication, Plaintiff threw a liquid substance on them. (Id.; Doc. 64, att. 4 at 2). Officer Broadhead attempted to secure the tray door but was unable to do so because Plaintiff blocked it with his hand. (Doc. 64, att. 4 at 2). Officer Broadhead then sprayed a one second burst of "Freeze plus P" spray into the tray door. (Id.; Doc. 1 at 8). Plaintiff responded by blocking the tray door with a towel. (Doc. 64, att. 4 at 2). Sergeant Watson removed the towel, and Officer Broadhead secured the tray door. (Id.).

Moments later, Defendants, Officer Lareka Brazile and Officer Terry Montgomery, came to Plaintiff's cell and demanded that he come to the door and "cuff up." (Doc. 1 at 8). Plaintiff refused. (Id.).

Lieutenant Jenkins then appeared at the cell with a cell extraction team comprised of Sergeant Ashworth, Sergeant Corbitt, Officer Brazile, Officer Brandon Carroll, Officer Michael Branch, Officer Ernest Stanton, and Officer Michael McCrory, and he ordered the officers to extract Plaintiff from his cell. (Id. at 9; Doc. 64, att. 11 at 3). Officer Stanton, the stun shield operator, was the first officer to enter the cell. (Doc. 64, att. 6 at 1). Stanton hit Plaintiff with the stun shield and delivered a stun, and Plaintiff fell to the floor. (Id.).

According to Plaintiff, as he was lying motionless on the cell floor, the members of the cell extraction team beat, stomped, and kicked him. (Doc. 1 at 9-10). Then, after the officers had secured him with handcuffs and leg irons, Lieutenant Jenkins ordered Officer Stanton to "shock [him] again." (Id. at 10). According to Plaintiff, Officer Stanton shocked him a second time, and the other officers stomped, kicked, and beat him again. (Id.). The officers then dragged Plaintiff by his leg irons to the elevator and beat him until they arrived at the health care unit. (Id. at 11).

The body chart completed by the nurse upon Plaintiff's arrival at the prison health care unit at 7:45 p.m. reflects that Plaintiff suffered a one-inch laceration and a bruise to his right forehead requiring two steri-strips. (Doc. 171, att. 2 at 50-51). In

addition, Plaintiff had a blood stain on his front teeth, an abrasion on the left side of his nose, and redness on his chest. (Id.). The nurse noted that Plaintiff's condition upon arrival was "fair," that he was uncooperative, and that he was "constantly talking during [his] examination." (Id. at 50-51). Plaintiff was released thirty minutes later in "satisfactory condition" and "ambulate[d] [without] difficult[y]" to his cell. (Id. at 50).

According to Plaintiff, when he returned to his cell, it was stripped of his personal belongings, as well as his mattress, sheets, clothing, blanket, soap, towel, washcloth, and toilet paper. (Doc. 1 at 11-12). In addition, the water had been turned off. (Id. at 12). Plaintiff remained in the "strip cell" for fourteen days. (Id.).

The following day, March 12, 2008, Plaintiff complained of left rib pain and was taken to the health care unit where he received hot and cold packs and pain medication. (Doc. 212, att. 1 at 42-43). Upon examination, the nurse noted tenderness and pain with movement, but no swelling, discoloration, tingling, or numbness. (Id.). Plaintiff then received an x-ray, which revealed no fracture, no abnormality, "no underlying pneumothorax or hemothorax," "no air in the soft tissues," and no abnormality with the lung and abdomen. (Doc. 137, att. 1 at 4). The impression of the radiologist was

"normal left ribs." (Id.).

Approximately one week later, on March 21, 2008, Plaintiff completed a sick call request, complaining of back problems, eye problems, and a "left hand bruise," for which he saw the doctor on March 24, 2008. (Doc. 220, att. 6 at 19; Doc. 137, att. 1 at 7). Plaintiff continued to complain of shoulder pain and was given pain medication and referred for additional x-rays of both shoulders on April 28, 2008. (Doc. 220, att. 6 at 35, 44; Doc. 212, att. 1 at 46-58). Those x-rays revealed no fracture, no dislocation, nor any abnormality of any kind. (Doc. 220, att. 6 at 44).

Over the following months, Plaintiff continued to complain of shoulder pain and continued to receive pain medication for those complaints. (Doc. 220, att. 6 at 59-60; Doc. 212, att. 1 at 59). On August 21, 2008, Plaintiff again received x-rays of both shoulders, and the x-rays again revealed no fracture, no dislocation, nor any abnormality of any kind. (Doc. 212, att. 1 at 60).

On January 26, 2009, almost one year after Plaintiff's altercation with Defendants, Plaintiff again complained of back pain and was given x-rays of his thoracic and lumbar spine. (Doc. 220, att. 9 at 1-2). Those x-rays revealed the thoracic spine to be "in excellent anatomic alignment," and the radiologist concluded that the thoracic spine was "normal" and "negative" for any problems.

(Id.).  The x-ray of the lumbar spine indicated a disk space narrowing at L5-S1, which had previously been discovered in January, 2008, before Plaintiff's altercation with Defendants.  (Id. at 2).  Otherwise, the lumbar spine and surrounding soft tissues were "normal," "unremarkable," and "unchanged" since the x-ray taken in January, 2008.  (Id.).

On the evening of June 9, 2009, Plaintiff was returning to his cell from taking a shower when Defendant, Sergeant Corbitt, asked him to "cuff up" and then proceeded to put the handcuffs around Plaintiff's wrists too tightly.  (Doc. 1 at 15-16).  Plaintiff asked Sergeant Corbitt to loosen the handcuffs, and Sergeant Corbitt refused.  (Id.).  When he arrived at his cell, Plaintiff told Sergeant Corbitt that he needed medical attention for his wrists, and Sergeant Corbitt again refused.  (Id.).

The next morning, June 10, 2009, at approximately 3:30 a.m., Sergeant Corbitt escorted Nurse Carroll through the segregation unit for pill call rounds, and Plaintiff informed Nurse Carroll that his wrist was swollen and that he needed medical attention.  (Id. at 16-17).  Nurse Carroll told Plaintiff that he would have to sign up for sick call screening.  (Id.).  Later that morning, at approximately 6:00 a.m., Officer D. Odoms escorted Plaintiff to the health care unit where the nurses noted a "small amount of tissue

swelling to [his] wrist," "no redness," "no broken skin." (Doc. 171, att. 2 at 45). Plaintiff was given Motrin and returned to his cell. (Id.).

On June 29, 2009, Plaintiff again complained of pain in his left wrist, and the prison doctor ordered x-rays of Plaintiff's left hand and wrist to be taken later in the week. (Doc. 171, att. 2 at 86). The following day, June 30, 2009, Plaintiff transferred from Holman prison to St. Clair Correctional Facility ("St. Clair"). (Doc. 171, att. 2 at 7, 37, 66).

## II. PROCEDURAL ASPECTS OF THE CASE

On March 8, 2010, Plaintiff filed the present § 1983 action, alleging that Defendant Warden Culliver violated his Eighth Amendment rights by confining him in a strip cell and allowing his officers to use excessive force; that Defendant Assistant Warden Watson Bishop violated his Eighth Amendment rights by confining him in a strip cell; that Defendants Sergeant Jenkins, Sergeant Ashworth, Sergeant Watson, Officer McCrory, Officer Stanton, Officer Brazile, Officer Sizemore, Officer Branch, and Officer Carroll violated his Eighth Amendment rights by using excessive force against him, by confining him in a strip cell, and by failing to provide medical treatment after he was choked by Defendant Broadhead; that Defendant Sergeant Corbitt violated his Eighth Amendment rights by using

excessive force against him, by confining him in a strip cell, and by failing to provide medical treatment to him after he was choked by Defendant Broadhead and after Corbitt put Plaintiff's handcuffs on too tight; that Defendant Officer Broadhead violated his Eighth Amendment rights by using excessive force against him and by failing to provide medical treatment to him after choking him; that Defendants Officer Burroughs and Officer Portis violated his Eighth Amendment rights by failing to provide medical treatment to Plaintiff after he was choked by Defendant Broadhead; and that Defendant Nurse Carroll violated his Eighth Amendment rights by failing to provide medical treatment to Plaintiff after Defendant Corbitt placed Plaintiff's handcuffs on too tight.[2]  (Doc. 1 at 19-46).  In addition, Plaintiff asserts state law assault and battery claims against Defendants Culliver, Jenkins, Ashworth, Watson, Corbitt, Broadhead, McCrory, Stanton, Brazile, Sizemore, Branch, and Brandon Carroll.[3]  (Id.).  In his request for relief, Plaintiff seeks compensatory and punitive damages, as well as injunctive relief.[4]

---

[2] Although Plaintiff references the Fourteenth Amendment in his Complaint, his claims are more properly construed as Eighth Amendment claims.

[3] Plaintiff also asserts various claims against Officer Terry Montgomery.  (Doc. 1 at 38).  However, to date, Plaintiff has not obtained service on this individual.

[4] Plaintiff is no longer incarcerated at Holman.  (Doc. 1 at 1). "[A]n

(Id. at 48).

In the Special Reports and Answers filed on behalf of Defendants on November 3, 2010, February 18, 2011, April 4, 2011, April 11, 2011, May 19, 2011, June 27, 2011, and August 15, 2011, Defendants deny Plaintiff's allegations and assert various defenses, including absolute and qualified immunity.[5]  (Docs. 63, 64, 104, 105, 128, 129,

---

inmate's claim for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once the inmate has been transferred." Brown v. Goodman, 2010 WL 2202515, *2 n.5 (S.D. Ala. 2010)(quoting Spears v. Thigpen, 846 F.2d 1327, 1328 (11th Cir. 1988)(internal quotation marks omitted)).  Therefore, Plaintiff's request for injunctive relief has been rendered moot.

[5] Plaintiff sues each of the Defendants in their official and individual capacities.  (Doc. 1 at 3).  As state officials, the Alabama Department of Corrections defendants are entitled to absolute immunity from suit for damages in their official capacities. See Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1278 (11th Cir. 1998) (state officials sued in their official capacities are protected from suit for damages under the Eleventh Amendment).
   In addition, "[q]ualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). Prior to the Supreme Court's decision in Pearson v. Callahan, 555 U.S. 223 (2009), the Court followed the mandatory procedure of Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson, 555 U.S. at 236, which required the Court to determine whether the plaintiff's allegations, if true, established a constitutional violation and, if the first step was satisfied, to determine whether the right at issue was clearly established at the time of the alleged misconduct.  While that procedure is now discretionary, as opposed to mandatory, see Pearson, id., the Court finds it beneficial in this case.  With respect to Plaintiff's Eighth Amendment claims related to his medical treatment and confinement

11

135, 136, 159, 160, 171, 172, 204).

On July 14, 2011, the Court ordered that Defendants' Special Reports and Answers be treated as motions for summary judgment. (Doc. 184). On November 22, 2010, April 25, 2011, May 16, 2011, and September 1, 2011, Plaintiff filed responses in opposition to Defendants' motion for summary judgment. (Docs. 75, 76, 147, 157, 207, 208, 209, 210, 211, 212). On September 26, 2011, the Court ordered Defendants to supplement their submission in support of their motions for summary judgment. (Doc. 219). On September 30, 2011,

---

in a strip cell, the Court has found that Plaintiff's allegations do not establish a constitutional violation. Therefore, "there is no necessity for further inquiries concerning qualified immunity" with respect to those claims. Saucier, 533 U.S. at 201. With respect to Plaintiff's Eighth Amendment excessive force claims, qualified immunity does not apply. See Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002).

The Court also notes that, as a private actor, Defendant, Nurse Carroll, is not entitled to immunity, whether qualified or absolute. See Swann v. Southern Health Partners, Inc., 388 F.3d 834, 837 (11th Cir. 2004), overruled, in part, on other grounds ("The parties agree that as a private entity, SHP [a private corporation employed by the County to provide medical care to inmates at the county jail] is not entitled to assert a qualified immunity defense."); Hinson v. Edmond, 205 F.3d 1264, 1265 (11th Cir. 2000) (a "privately employed prison physician" "is ineligible to advance the defense of qualified immunity"); Edwards v. Alabama Dep't of Corrections, 81 F. Supp. 2d 1242, 1254 (M.D. Ala. 2000) (a private entity contracting with a state to provide medical services to state inmates "is not entitled to qualified immunity...."). Similarly, with respect to absolute immunity, the Court is aware of no case extending absolute immunity to a privately employed nurse providing medical services to state inmates.

and October 21, 2011, Defendants filed their supplemental

submissions. (Docs. 220, 224). Defendants' motions, Plaintiff's

responses, and the parties' supplemental submissions are now before

the Court.

III. SUMMARY JUDGMENT STANDARD

In analyzing the propriety of a motion for summary judgment,

the Court begins with these basic principles. The Federal Rules of

Civil Procedure grant this Court authority under Rule 56 to render

"judgment as a matter of law" to a party who moves for summary

judgment. It is well established that summary judgment is proper

under Federal Rule of Civil Procedure 56 "if the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine

issue as to any material fact. . . ." Celotex Corp. v. Catrett, 477

U.S. 317, 322 (1986). However, all of the evidence and factual

inferences reasonably drawn from the evidence must be viewed in the

light most favorable to the nonmoving party. Adickes v. S.H. Kress

& Co., 398 U.S. 144, 157 (1970); Jackson v. BellSouth Telecomms.,

372 F.3d 1250, 1280 (11th Cir. 2004).

Federal Rule of Civil Procedure 56(e) provides:

> If a party fails to properly support an
> assertion of fact or fails to properly address
> another party's assertion of fact as required
> by Rule 56(c), the court may:

13

> (1) give an opportunity to properly
> support or address the fact;
> (2) consider the fact undisputed for
> purposes of the motion;
> (3) grant summary judgment if the motion
> and supporting materials--including the
> facts considered undisputed--show that
> the movant is entitled to it; or
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

Summary judgment is proper when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." McDowell v. Brown, 392 F.3d 1283, 1288 (11th Cir. 2004) (citations and internal quotation marks omitted). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted). Summary judgment should be granted "where a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 647 (11th Cir. 2007) (citations omitted).

## IV.  DISCUSSION

As set forth above, Plaintiff seeks redress pursuant to 42 U.S.C. § 1983 for alleged constitutional deprivations arising out of incidents that occurred on March 11, 2008, and June 9, 2009, while Plaintiff was incarcerated in the segregation unit at Holman Correctional Facility.  Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983 (1994).  For the reasons set forth below, it is recommended that Defendants' motions for summary judgment be granted in part and denied in part.

### A. Eighth Amendment Excessive Force Claims.

Plaintiff's excessive force claims arise out of three distinct events alleged in his Complaint.  First, Plaintiff alleges that, on March 11, 2008, Defendant Broadhead choked him while they were in the elevator en route to Plaintiff's cell.  Second, Plaintiff alleges that, later that day, Defendants Jenkins, Ashworth, Corbitt, Watson, McCrory, Stanton, Brazile, Sizemore, Branch, and Brandon Carroll used excessive force against him during a cell extraction.

15

Last, Plaintiff alleges that, on June 9, 2009, Defendant Corbitt put Plaintiff's handcuffs on too tight.

The Eighth Amendment protects a prisoner from punishment that is cruel and unusual. Graham v. Connor, 490 U.S. 386, 394 (1989). Specifically, the Eighth Amendment "prohibits the unnecessary and wanton infliction of pain, . . . the infliction of pain totally without penological justification. . . , [and] the infliction of punishment grossly disproportionate to the severity of the offense." Ort v. White, 813 F.2d 318, 321 (11th Cir. 1987) (citing Rhodes v. Chapman, 452 U.S. 337, 346 (1981)).

In order to establish an Eighth Amendment claim, a plaintiff must prove both an objective and subjective component. First, Plaintiff must show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation, and, second, Plaintiff must show that "the officials act[ed] with a sufficiently culpable state of mind," i.e., that they acted "maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-8 (1992).

In the prison security context, the factors used to determine whether there has been a violation of the Eighth Amendment are: the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived, any efforts to temper the severity of a forceful response, and the extent

of injury suffered.  <u>Hudson</u>, 503 U.S. at 7 (citing <u>Whitley v. Albers</u>, 475 U.S. 312, 321 (1986)).  The courts recognize that corrections officials often must make decisions "'in haste, under pressure, and frequently without the luxury of a second chance.'"  <u>Id.</u> at 6 (citing <u>Whitley</u>, 475 U.S. at 320).  Therefore, "'the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'"  <u>Id.</u> (citations omitted).

The issue before the Court now is whether, under the circumstances of this case, a jury could reasonably conclude that Plaintiff's rights under the Eighth Amendment were violated during any of the incidents alleged.  The Court considers each of the alleged instances of excessive force separately.

1. <u>Choking incident</u>.

As discussed above, Plaintiff claims that Correctional Officer Joel Broadhead used excessive force by choking him on March 11, 2008, while they were in the elevator en route to his cell.  The evidence shows that Officers Broadhead and Ashworth were escorting Plaintiff to sick call screening when Plaintiff saw Lieutenant Tyrone Jenkins and began complaining to him that, four days earlier, his personal property had gone missing during a cell search conducted by Defendants Broadhead and Ashworth.  (Doc. 1 at 4).  The conversation

between Plaintiff and Lieutenant Jenkins became disruptive, and Jenkins ordered that Plaintiff be taken back to his cell.[6]  (Id. at 5; Doc. 151, att. 1 at 1).

At approximately 5:55 p.m., Defendants Portis, Burroughs, and Broadhead began escorting Plaintiff back to his cell.  (Id. at 5; Doc. 64, att. 3 at 1).  Plaintiff's hands were handcuffed behind his back at the time.  (Id. at 5).  Plaintiff states that, when he entered the elevator, he began questioning Officer Broadhead about what happened to his personal property.  (Doc. 1 at 5).  "At th[at] moment," Officer Broadhead became angry and began choking Plaintiff with both hands, yelling "don't ask me about no damn property. . . . [d]on't ask me nothing."  (Id.).  Plaintiff states that Defendant Broadhead "chok[ed] [him] out."  (Doc. 212, att. 1 at 8).  The elevator then arrived on the middle floor, and Officer Broadhead exited.  Plaintiff continued to the top floor with Officers Portis and Burroughs, and he demanded that they take him to the health care unit.  However, they refused and returned him to his cell.  (Doc. 1 at 6; Doc. 151, att. 1 at 2).

In his affidavit, Officer Broadhead adds that he and several

---

6 Specifically, Lieutenant Jenkins states that he informed Plaintiff that he knew nothing about the property that had been taken and that Plaintiff needed to speak with the Shift Commander who had been working that shift.  (Doc. 129, att. 1 at 1).  Plaintiff became upset and refused to cooperate with the nurse who was conducting the sick call screening.  (Id. at 2).  At that point, Lieutenant Jenkins ordered that Plaintiff be taken back to his cell.  (Id.).

officers conducted a search of Plaintiff's cell on March 7, 2008, during which they found a razor blade. (Doc. 64, att. 4 at 1). Four days later, on March 11, 2008, he and Officer Portis escorted Plaintiff to sick call screening, but they had to remove Plaintiff when he became loud and disorderly. (Id.). On their way back to the segregation unit, they entered the elevator. According to Officer Broadhead, Plaintiff "was being very loud and claiming that [Defendant Broadhead] took his personal items." (Id. at 2). According to Officers Portis and Burroughs, Plaintiff was yelling and cursing in the elevator and moved aggressively toward Officer Broadhead, and Broadhead pushed Plaintiff back, knocking him to the floor. (Doc. 151, att. 1 at 2; Doc. 64, att. 3 at 1-2). Officer Broadhead then exited the elevator.[7] (Id.).

Officer Broadhead maintains that, "[a]t no time did I choke or strangle inmate Cunningham. . . ." (Doc. 64, att. 4 at 2). (Id.). However, for purposes of the motions for summary judgment, the Court assumes, as Plaintiff claims, that Officer Broadhead did choke Plaintiff.

---

7 The evidence shows that, after Officer Broadhead exited the elevator, Plaintiff continued to be disruptive. (Doc. 151, att. 1 at 2; Doc. 64, att. 3 at 1-2). As Plaintiff was being led back to his cell, he stopped walking and stood in the hallway cursing and yelling at Officers Burroughs and Portis. (Doc. 64, att. 3 at 2). The officers instructed Plaintiff to keep walking, and he complied. However, he continued cursing and yelling, even after being put back in his cell, and he refused to allow his handcuffs to be removed. (Id.; Doc. 151, att. 1 at 2).

Turning to the factors enumerated above, the Court first considers the threat reasonably perceived by Officer Broadhead and the need for the application of force. As discussed above, the evidence shows that Plaintiff created a disturbance at sick call screening related to property that he claimed was wrongfully taken from his cell. Plaintiff was loud and disruptive, and his behavior resulted in him being removed from the area by three officers. The conflict did not end there. Immediately upon entering the elevator, Plaintiff confronted Officer Broadhead, accusing him of taking the property. Plaintiff's aggressive behavior toward Officer Broadhead could reasonably have been perceived to be threatening.

In addition to his behavior on the day in question, the record shows that Plaintiff had a history of threatening behavior toward prison guards and other inmates. Plaintiff's prison record includes an assault on an ADOC officer in July, 2007. Officer Broadhead was the arresting officer with respect to that incident.[8] (Doc. 220, att. 2 at 15). In addition, Plaintiff had at least seven other alterations with corrections officers during 2007 and the first three months of 2008. (Doc. 171, att. 2 at 55-60; Doc. 220, att. 2 at 15, 39-40; Doc. 220, att. 5, at 24; Doc. 220, att. 6 at 5).

Also, in the year preceding his altercation with Officer

---

8 The evidence shows that Plaintiff had an ongoing problem with an officer named Moody, resulting in repeated altercations between the two. (Doc. 212 at 40). It is unclear whether the July, 2007, incident involved Officer Moody or another officer.

Broadhead, Plaintiff's mental health providers noted serious
concerns about his mental stability and chronicled threats made by
Plaintiff against the staff and other inmates at Holman. (Doc. 220,
att. 1 at 4-5, 21; Doc. 220, att. 2 at 114; Doc. 220, att. 3 at 13;
Doc. 220, att. 5 at 9-10). In February, 2007, a prison psychiatrist
noted that Plaintiff was suffering from nightmares and flashbacks
to killing his victim. (Doc. 220, att. 1 at 4). In April, 2007,
Plaintiff was placed in a crisis cell for cutting himself. (Doc.
220, att. 1 at 5). A prison therapist described him as "angry,
hostile, blaming, demanding, threatening, [and] manipulative."
(Id.). In an apparent reference to corrections officers, Plaintiff
stated, "if one of those mother fuckers come (sic) near me I will
kill them." (Doc. 220, att. 1 at 21). In September, 2007, the
therapist noted that Plaintiff was "increasingly agitated and
hostile," "blaming," and "refusing to take responsibility for own
actions." (Doc. 220, att. 2 at 114). In October, 2007, the
therapist described Plaintiff as "threatening [and] hostile,"
"refuses to accept responsibility for actions," "continues to blame
DOC for behavior," and makes the "same veiled threats to DOC." (Doc.
220, att. 3 at 13). In January, 2008, the prison psychiatrist again
noted that Plaintiff was having sleep disturbances caused by
"nightmares about [his] legal situation and flashbacks to his
victims." (Doc. 220, att. 5 at 9). The psychiatrist noted that

Plaintiff had cut the back side of his wrist and again had been placed in a crisis cell. (Id. at 10). Plaintiff told the psychiatrist that his neighbor "runs his mouth" and that the "cell door keeps me from hurting [him]." (Id. at 11). On March 9, 2008, two days before Plaintiff's altercation with Officer Broadhead in the elevator, Plaintiff was escorted away from sick call screening for "becoming hostile and almost slipping out of [his] handcuffs." (Doc. 220, att. 6 at 5). Given Plaintiff's history of mental illness, threats of violence, and acts of violence, as well as his behavior at sick call screening and in the elevator on the day in question, Officer Broadhead reasonably perceived a threat from Plaintiff and reasonably perceived the need for the application of force to restore discipline.

With respect to the amount and type of force used by Officer Broadhead, it is without question that the use of choking as a means of gaining control over an inmate is a serious and potentially hazardous form of physical force. However, in this particular instance, the amount of force appears to have been minimal, as evidenced by the absence of any injury related to the choking, and brief, as it occurred between stops on an elevator. The evidence shows that two hours after the choking incident with Officer Broadhead, following the cell extraction, Plaintiff was taken to the health care unit where he was examined thoroughly by the medical

staff.  The body chart completed at that time reflected no sign of any injury caused by choking, whether in the form of marks, scratches, redness, bruising, or any other symptom or injury related to choking. (Doc. 171, att. 2 at 50-51).

With respect to efforts made to temper the severity of the response, the Court notes that, almost as soon as the altercation began, Officer Broadhead removed himself from the situation by exiting the elevator on the next floor, and he allowed Officers Portis and Burroughs to complete the escort without him.  By doing so, Officer Broadhead diffused a deteriorating situation and possibly prevented the further use of force or injury.

Finally, it is undisputed that Officer Broadhead did not instigate the altercation with Plaintiff.  To the contrary, Plaintiff created a disturbance at sick call with Lieutenant Jenkins and carried that hostility over into a direct confrontation with Officer Broadhead in the elevator.  Even when viewed in a light most favorable to the Plaintiff, the evidence simply does not support Plaintiff's claim that Officer Broadhead, totally without penological justification, maliciously and sadistically attacked him for the very purpose of causing harm.

Bearing all of these factors in mind, the Court finds that, under the circumstances of this case, the force used by Officer Broadhead against Plaintiff in the elevator was not constitutionally

excessive.  Therefore, Plaintiff's Eighth Amendment excessive force claim against Defendant Broadhead related to the choking incident in the elevator fails as a matter of law, and Defendant Broadhead's motion for summary judgment on this claim is due to be granted.

2. <u>Handcuffs incident</u>.

Plaintiff also claims that, on the evening of June 9, 2009, Defendant Corbitt put his handcuffs on too tightly when escorting him back to his cell from the shower.  (Doc. 1 at 15-16).  Plaintiff states that he asked Sergeant Corbitt to loosen the handcuffs, and Sergeant Corbitt responded, "go to your cell[.] [Y]ou will be okay." (<u>Id.</u>).  Plaintiff continued to ask Sergeant Corbitt to loosen the handcuffs, and Sergeant Corbitt replied, "just go to your cell and stop complaining."  (<u>Id.</u>).  When he arrived at his cell, Plaintiff told Sergeant Corbitt that he needed medical attention for his wrists and asked to see Lieutenant White.  (<u>Id.</u>).  Sergeant Corbitt refused.  (<u>Id.</u>).

The next morning at approximately 3:30 a.m., Plaintiff informed Nurse Carroll during pill call rounds that his wrist was swollen and that he needed medical attention.  (<u>Id.</u> at 16-17).  She told Plaintiff that, if he needed medical attention for his wrist, he would have to sign up for sick call screening.  (<u>Id.</u>).

At approximately 6:00 a.m., Plaintiff notified Officer D. Odoms that he needed medical attention for his wrists, and Officer Odoms

escorted him to the health care unit. (Id.). Upon arrival at the health care unit, the nurses noted a "small amount of tissue swelling to wrist," "no redness," and "no broken skin." (Doc. 171, att. 2 at 45). Plaintiff was given Motrin and returned to his cell. (Id.).

Eighteen days later, on June 28, 2009, Plaintiff complained of problems with his wrists, and the prison doctor ordered x-rays of Plaintiff's left hand and wrist to be taken later in the week. (Doc. 171, att. 2 at 39, 86). Two days later, on June 30, 2009, Plaintiff transferred from Holman prison to St. Clair Correctional Facility and reported no problems with his wrists.[9] (Doc. 171, att. 2 at 7, 37, 66).

In order to establish the objective component of his Eighth Amendment excessive force claim, Plaintiff must prove that the wrongdoing by Sergeant Corbitt was objectively "harmful enough" to establish a constitutional violation. Hudson, 503 U.S. at 8. This component "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."[10] Hudson, 503

---

9 Plaintiff's medical records from St. Clair Correctional Facility indicate that his only complaint upon transfer was low back pain associated with the L-5, S-1 disk narrowing. (Doc. 171, att. 2 at 37, 66). There was no mention of any problem with his wrists.

10 A plaintiff can establish a constitutional claim based on excessive force, even in the absence of serious or significant injury, if he has been subjected to treatment that is "diabolic or inhuman" or of a sort repugnant to the conscience of mankind.

U.S. at 9-10 (citations and internal quotation marks omitted).

In this case, it is undisputed that Plaintiff suffered nothing more than a "small amount of tissue swelling" to his wrist, and he complained of pain for approximately three weeks following the incident.[11]  (Doc. 171, att. 2 at 39, 41, 45).  This minor injury does not support a finding that Plaintiff was subjected to anything other than *de minimis* force, which is insufficient to establish a constitutional violation under the Eighth Amendment.  <u>Cf.</u> <u>Johnson v. Moody</u>, 206 Fed. Appx. 880, 882 (11th Cir. 2006) (summary judgment proper where plaintiff failed to show that alleged wrongdoing was objectively harmful enough to establish a constitutional violation; evidence showed guard slammed tray door on inmate's finger resulting in complaints of pain for six months and a cut for which inmate was given Motrin, a bandage, and a tetanus shot); <u>see also</u> <u>Johnson v. City of New York</u>, 2011 WL 1044852, *6 (S.D.N.Y. 2011) ("this Court concludes that the alleged conduct involving tightly fastened handcuffs is not sufficiently serious or harmful enough to be actionable.") (citations and internal quotation marks omitted).

---

<u>Hudson</u>, 503 U.S. at 9-10.  Plaintiff makes no such allegations against Defendant Corbitt related to the use of the handcuffs. Therefore, the fact that Plaintiff's injury was minor is an important factor in determining whether more than *de minimis* force was used.

11 The nurse noted on June 28, 2009, that Plaintiff was handcuffed behind his back without difficulty and that he was experiencing no tenderness, no pain with movement, no weakness, no discoloration, no numbness, and no swelling.  (Doc. 171, att. 2 at 30).

Based on the foregoing, Plaintiff's excessive force claim against Sergeant Corbitt for placing his handcuffs on too tightly fails as a matter of law.

Assuming, *arguendo*, that Plaintiff had established the objective component of his Eighth Amendment claim, his claim still fails inasmuch as he has failed to show that Sergeant Corbitt acted "maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7. As discussed above, Plaintiff had a history of creating disturbances and engaging in frequent altercations with corrections officers. His prison records show that, in March, 2008, he had to be escorted back to his cell after "becoming hostile and almost slipping out of handcuffs." (Doc. 220, att. 6 at 5). Because Plaintiff has failed to show that Sergeant Corbitt acted maliciously and sadistically in placing his handcuffs on too tightly, he has failed to establish the subjective component of his Eighth Amendment claim, and, therefore, his excessive force claim fails as a matter of law for this reason as well.

3. Cell extraction.

In his Complaint, Plaintiff alleges that Defendants Jenkins, Ashworth, McCrory, Stanton, Brazile, Branch, Brandon Carroll, Corbitt, Watson, and Sizemore[12] entered his cell during a cell

---

12 There is no evidence that Officers Watson or Sizemore were part of the extraction team or otherwise involved in the cell extraction. (Doc. 64, att. 13 at 1; Doc. 64, att. 7 at 3). Therefore, Defendants

extraction, shocked him with a stun shield, beat and kicked him,
secured him in handcuffs and leg irons, shocked him a second time
with the stun shield, and beat and kicked him again, all despite the
fact that he was lying motionless on the floor after the first shock.
(Doc. 1 at 9-11, 25, ).  Defendants then dragged him to the health
care unit for medical treatment.  (Id. at 10).  For purposes of the
motions for summary judgment, the Court assumes Plaintiff's
allegations as true.

"Under the Eighth Amendment, force is deemed legitimate in a
custodial setting as long as it is applied 'in a good faith effort
to maintain or restore discipline [and not] maliciously and
sadistically to cause harm.'"  Skrtich v. Thornton, 280 F.3d 1295,
1300 (11th Cir. 2002) (quoting Whitley, 475 U.S. at 320-21).
"[G]overnment officials may not use gratuitous force against a
prisoner who has been already subdued or . . . incapacitated."  Id.
at 1303 (citations omitted).  "The use of force must stop when the
need for it to maintain or restore discipline no longer exists."  Id.
at 1304 (citations omitted).

In determining whether the alleged use of force associated with
the cell extraction in this case was applied "in a good faith effort
to maintain or restore discipline" or "maliciously and sadistically

---

Watson and Sizemore are entitled to summary judgment on Plaintiff's
excessive force claims arising out of the cell extraction for lack
of evidence of causation.

to cause harm," the Court again considers the factors set forth in Hudson, 503 U.S. at 7. These factors include the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, any efforts made to temper the severity of a forceful response, and the extent of the injury suffered by the inmate. Id.

Applying these factors to the present case, there is no question that Plaintiff's behavior preceding the cell extraction was reasonably perceived as a threat to prison security and discipline and required the application of some measure of force to resolve. The evidence, as previously found by this Court, shows that Plaintiff repeatedly refused orders from several officers to remove his handcuffs,[13] to put on his handcuffs, to walk to his cell, to come out of his cell. Plaintiff was persistently and steadfastly non-compliant with virtually every order that he received. He was angry, combative, and out of control. He threw a liquid substance on three officers and a nurse who delivered his medication during pill call rounds, resulting in an order from Warden Culliver for his

13 One of Plaintiff's witnesses, inmate Richard Sanders, testified in his affidavit that he saw Plaintiff "snatch his [wrist] back as Officer Portis was trying to take the handcuffs off ," and he observed Officer Sizemore arrive and tell Plaintiff, "it is not looking to (sic) good for [you.] [You] needs (sic) to give him the hand-cuffs." (Doc. 1 at 56-58).

cell to be stripped. At that point, he adamantly refused to leave his cell so that it could be stripped. Without question, based on Plaintiff's conduct, the officers reasonably perceived a threat from him which required the application of some measure of force.[14]

With respect to the type of force used and whether efforts were made to temper the severity of the response, the evidence shows that multiple attempts were made by several officers to persuade Plaintiff to come out of his cell voluntarily, and he refused every time. The officers' continued attempts to persuade Plaintiff to vacate his cell voluntarily evidence their efforts to temper the severity of the response by avoiding a cell extraction if possible. Because Plaintiff repeatedly refused to cooperate, the cell extraction could not be avoided.[15] Under the circumstances, the use of a cell extraction was reasonable.

---

[14] As discussed above, Plaintiff is a violent inmate, with serious mental health problems, who has had frequent altercations with corrections officers. Only four days before the cell extraction, officers had confiscated a razor blade from his cell. (Doc. 64, att. 4 at 1). The officers had every reason to perceive a serious threat from Plaintiff.

[15] The evidence shows that, when the cell extraction team arrived at Plaintiff's cell, he had wrapped his body in clothing, books, and a blanket. (Doc. 129, att. 1 at 2). The nurse confirmed this bizarre behavior in her medical report, noting that, when Plaintiff arrived at the health care unit, there was a "blue blanket with inmate clothing tying inmate." (Doc. 171, att. 2 at 50). The incident report also states that "[i]nmate Cunningham had his arms wrapped with strips of his cut up blanket when the cell extraction team entered the cell." (Doc. 64, att. 11 at 3). Thus, it appears that Plaintiff deliberately planned to resist the officers' efforts to remove him from his cell and had prepared for the confrontation.

That being said, the amount of force allegedly used during the cell extraction is troubling.  Plaintiff alleges that he was shocked twice with a stun shield, despite the fact that he was secured in leg irons, handcuffed to his back, and lying motionless on the floor after the first shock.  He further alleges that he was beaten after each shock and dragged to the health care unit.  Defendants deny delivering a second shock with the stun shield, and they deny beating Plaintiff.

Considering, first, the physical force that Plaintiff alleges that he received during the cell extraction, *i.e.*, the beating, the Court finds that the evidence does not support Plaintiff's claim that anything other than *de minimis* force was used against him in that respect.  Despite the extremely violent picture painted by Plaintiff with regard to the beating, his injuries from the encounter were astonishingly minor.  The undisputed evidence shows that Plaintiff suffered a one-inch laceration to his forehead, which was a re-opening of a wound that he had sustained the previous week, requiring the application of two steri-strips.  (Doc. 171, att. 2 at 50-51; Doc. 220, att. 5 at 45, 51-53).  In addition, Plaintiff had a blood stain on his front teeth, an abrasion on the left side of his nose, and redness on his chest.  (Doc. 171, att. 2 at 50-51).  Plaintiff was released after only thirty minutes in the health care unit, and he "ambulate[d] [without] difficult[y]" to his cell.

(Id.).  The following day, x-rays of Plaintiff's left ribs revealed

no broken bones, no fractures, and no abnormalities of any kind.  His

lung and abdomen were "normal," and there was no swelling,

discoloration, or numbness in those areas.[16]  (Doc. 137, att. 1 at

4; Doc. 212, att. 1 at 42-43).

Without question, Plaintiff's injuries are in sharp contrast

to those suffered by the inmate in Skrtich, 280 F.3d 1295, 1299 (11th

Cir. 2002), which involved remarkably similar allegations of

excessive force arising out of a cell extraction.  In Skrtich, the

Eleventh Circuit held that Defendants were not entitled to summary

judgment on plaintiff's claim of excessive force where the inmate

had to be "airlifted by helicopter to a hospital, where he remained

for nine days and was treated for extensive injuries and spent several

months recuperating."  Skrtich, 280 F.3d at 1300.  The inmate's

injuries from the cell extraction in Skrtich included, "(1) left

chest trauma with multiple fractures to the left ribs and left

hemopneumothorax, (2) back injury with fractured multiple transverse

processes, (3) right scalp laceration, (4) left shoulder and right

knee injury, (5) abdominal trauma, and (6) post trauma anemia."  Id.

---

16 Over the following months, additional x-rays revealed "normal"
left and right shoulders and normal thoracic spine.  (Doc. 220, att.
6 at 44; Doc. 212, att. 1 at 60; Doc. 220, att. 9 at 1-2).  An x-ray
of Plaintiff's lumbar spine indicated no problems, with the exception
of a disc space narrowing at L5-S1, which had previously been
discovered in January, 2008, two months before the cell extraction.
(Doc. 220, att. 9 at 2).

In addition, his chest "[r]evealed the presence of an extensive amount of injuries with multiple abrasions and contusions and several markings of shoes on his back and left chest," which markings a doctor found "were probably made from a stomping motion as opposed to merely holding [the inmate] down," "consistent with physical abuse." Id. (internal quotation marks omitted).

While no "certain quantum of injury" need be sustained by a plaintiff in order to establish an excessive force claim, the absence of significant injury is a factor to consider in determining the amount of force applied. Wilkins v. Gaddy, _ U.S. _, 130 S. Ct. 1175, 1178 (2010). The law is clear that "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" Id. (citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Hudson, 503 U.S. at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). Although Plaintiff alleges that he was severely beaten by nine hostile corrections officers, the evidence of his exceedingly minor injuries belies his claim that anything other than de minimis force was used. Because "[t]he Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind," Wilkins, _

U.S. _, 130 S. Ct. at 1178 (citations and internal quotation marks omitted), Defendants Jenkins, Ashworth, McCrory, Stanton, Brazile, Branch, Brandon Carroll, Corbitt, Watson, and Sizemore are entitled to summary judgment on Plaintiff's excessive force claim based on the alleged physical force, *i.e.*, the beating, that he received during the cell extraction.

Defendants' use of the stun shield during the cell extraction, however, is a different matter. Unlike a corporal beating by nine corrections officers, a shock from a stun shield delivers pain in a manner that is not designed to result in discernible bodily injury. Therefore, the absence of significant physical injury from the use of a stun shield would not suggest the absence of excessive force.

Applying the Hudson factors to the Defendants' use of the stun shield, the Court is satisfied that the first shock with the stun shield applied by Officer Stanton during the cell extraction was necessary and reasonable given that the officers were compelled to forcibly remove a hostile inmate from his cell. An inmate "is not at liberty to ignore or disobey, without consequence, the lawful orders of his custodians or the rules and regulations of a jail." West v. Sconyers, 2010 WL 4822084, *7 (M.D. Ala. 2010) (unpublished). "Strict adherence to rules and orders within a penal institution's walls are necessary for discipline, and even more importantly, for the safety and security of inmates, guards, and visitors alike." Id.

That being said, whether a *second* shock was administered and was necessary to control a resisting inmate are matters that are in dispute in this case. Defendants maintain that Plaintiff was struggling "violently" "the entire time" that the cell extraction was taking place and that Plaintiff was shocked only once with the stun shield, secured, and then removed from the cell. (Doc. 64, att. 6 at 1-2). Plaintiff directly disputes this testimony and maintains that he was shocked, not once, but twice, despite the fact that he was not resisting after the first shock. Plaintiff claims that Defendants secured him in handcuffs and leg irons after the first shock, and he was lying motionless and "semi-unconscious" on the floor when he received the second shock. (Doc. 1 at 9-10). According to Plaintiff, after he was subdued, Lieutenant Jenkins stated, "shock that bitch again and kick his ass real good[.] We need to teach that fuck boy a lesson." (Id. at 10).

Plaintiff's allegations related to the use of the stun shield in this case raise serious questions about the force that was used against him during the cell extraction. If Plaintiff's version of the facts is true, the second shock with the stun shield constituted "gratuitous force against a prisoner who has been already subdued or . . . incapacitated." Skrtich, 280 F.3d at 1303. This type of unnecessary and wanton infliction of pain is prohibited by the Eighth Amendment. See Hudson, 503 U.S. at 5.

While the Court recognizes that the facts at trial may turn out differently than the facts presented on summary judgment, on Plaintiff's facts, Defendants violated his constitutional rights by shocking him a second time with the stun shield while he was lying motionless and non-resisting on the floor.  Cf. Skrtich, 280 F.3d at 1305(defendants not entitled to summary judgment where plaintiff claimed that, "after he was rendered inert by the electric shock [from a stun shield] and was not resisting, indeed not capable of resisting, the officers administered a severe beating with no other purpose than the infliction of pain."); West, 2010 WL 4822084, *8 (M.D. Ala. 2010) ("disputed issues of material fact exist regarding the need for the use of force after [plaintiff] was initially hit with the electric stun shield and whether the amount of force used from that point onward was appropriate, reasonable, and/or necessary.").

Generally, after a constitutional violation has been established, the Court considers whether the right was clearly established in order to determine whether the defendant is entitled to qualified immunity.  See Saucier, 533 U.S. at 201, *overruled in part*, Pearson, 555 U.S. at 236.  However, as noted above, the Eleventh Circuit has held that, in cases such as this, there is no room for qualified immunity because the use of force "maliciously and sadistically to cause harm" is clearly established to be a constitutional violation.  Skrtich, 280 F.3d at 1301 (citing Hudson,

503 U.S. 1 (1992), and <u>Whitley</u>, 475 U.S. 312 (1986)). Thus, qualified immunity is not available to Defendants with respect to Plaintiff's excessive force claim arising out of the use of the stun shield.

Because disputed issues of material fact exist regarding whether a second shock was administered with the stun shield and, if so, whether the second shock was appropriate, reasonable, and necessary to restrain Plaintiff, the motions for summary judgment of Defendants Jenkins, Ashworth, McCrory, Stanton, Brazile, Branch, Brandon Carroll, and Corbitt are due to be denied with respect to Plaintiff's excessive force claim based on use of the stun shield.[17]

B. <u>Eighth Amendment Denial of Medical Care Claims</u>.

"The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." <u>Campbell v. Sikes</u>, 169 F.3d 1353, 1363 (11th Cir. 1999)(citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)). As with an Eighth Amendment excessive force claim, an Eighth Amendment denial of medical care claim has

_____

17 As noted above, Defendants Watson and Sizemore are entitled to summary judgment on this claim because there is no evidence that they were involved in the cell extraction. In addition, as discussed separately herein, Plaintiff's allegations of excessive force against Defendant Culliver related to the cell extraction are insufficient to establish causation through supervisory liability or personal participation. Therefore, Defendant Culliver is likewise entitled to summary judgment on Plaintiff's excessive force claim arising out of the cell extraction.

two components, "an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind." Sims v. Mashburn, 25 F.3d 980, 983 (11th Cir. 1994) (citing Hudson, 503 U.S. at 8).

To meet the objective requirement of an Eighth Amendment denial of medical care claim, a plaintiff first must demonstrate the existence of an "objectively serious medical need." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (internal quotation marks and citation omitted).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need. Farrow, 320 F.3d at 1243. "Deliberate indifference" entails more than mere negligence. Estelle, 429 U.S. at 106; Farmer v. Brennan, 511 U.S. 825, 835 (1994).

The Supreme Court clarified the "deliberate indifference" standard in Farmer by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety*; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added). In interpreting Farmer and Estelle, this Court explained in McElligott that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott, 182 F.3d at 1255; Taylor, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

Farrow, 320 F.3d at 1245-46 (emphasis in original).

1. Choking incident.

In the discussion of Plaintiff's excessive force claim against Officer Broadhead arising out of the choking incident, the Court found that the use of force was not excessive and that Plaintiff had not suffered any serious injury therefrom. Having so found, Plaintiff's Eighth Amendment claim based on the denial of medical treatment following the incident fails as a matter of law.

In order to meet the objective element of an Eighth Amendment denial of medical care claim, a plaintiff first must demonstrate the existence of an "objectively serious medical need." Farrow, 320

F.3d at 1243.  This, Plaintiff has failed to do.  Therefore, the motions for summary judgment of Defendants Jenkins, Ashworth, Watson, Corbitt, Burroughs, Portis, McCrory, Stanton, Brazile, Sizemore, Branch, Brandon Carroll, and Broadhead related to Plaintiff's claims for the denial of medical treatment following the choking incident are due to be granted.

   2. Handcuffs incident.

   In the discussion of Plaintiff's excessive force claim against Sergeant Corbitt and Nurse Carroll arising out of the handcuffs incident, the Court found that Plaintiff suffered no serious injury from Sergeant Corbitt putting Plaintiff's handcuffs on too tightly when he escorted Plaintiff to his cell from the shower.  Because Plaintiff has failed to demonstrate the existence of an "objectively serious medical need" arising out of the handcuffs incident, his Eighth Amendment claims based on the denial of medical care following that incident fail as a matter of law.  Farrow, 320 F.3d at 1243. Therefore, the motions for summary judgment of Defendants Corbitt and Nurse Carroll related to those claims are due to be granted.

   Assuming, arguendo, that Plaintiff had established a serious medical need arising out of the handcuffs incident, his claims would still fail because he has failed to show that Defendants were "deliberately indifferent" to his serious medical need.  Farrow, 320 F.3d at 1245.  The evidence in this case is undisputed that Plaintiff

was taken to the health care unit for treatment of his wrist injury at 6:00 a.m. on the morning following the incident. While delay in access to medical care can violate the Eighth Amendment "when it is tantamount to unnecessary and wanton infliction of pain," "[c]ases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." Hill, 40 F.3d at 1187 (citations and internal quotation marks omitted). There is no such evidence in this case. Although Plaintiff did not receive medical treatment for his swollen wrist on the same evening that he was allegedly injured, he did receive treatment for his non-emergency injuries early the next morning. That is sufficient under the Constitution.

Accordingly, for each of these reasons, Plaintiff's Eighth Amendment denial of medical care claims against Sergeant Corbitt and Nurse Carroll arising out of the handcuffs incident fail to establish a constitutional violation, and the motions for summary judgment of Defendants Corbitt and Carroll related to those claims are due to be granted.

C. Eighth Amendment Violation Arising out of Confinement in a Strip Cell.

Plaintiff next alleges that Defendants Culliver, Bishop, Jenkins, Ashworth, Watson, Corbitt, McCrory, Stanton, Brazile,

41

Sizemore, Branch, and Brandon Carroll violated his Eighth Amendment rights by confining him in a strip cell for fourteen days and depriving him of his personal property, mattress, sheets, clothing, blanket, soap, towel, washcloth, toilet tissue, and running water. (Doc. 1 at 11-12). The undisputed evidence shows that Plaintiff's cell was stripped on March 11, 2008, after he threw a liquid substance on three correctional officers and a nurse who were attempting to deliver medicine during pill call rounds.[18] (Doc. 64, att. 1 at 1-3; Doc. 64, att. 11 at 1).

As discussed above, an Eighth Amendment claim has two components, "an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind." Sims, 25 F.3d at 983. In addition, Plaintiff must show "that the constitutional violation caused his injuries." Marsh v. Butler County, Ala., 268 F.3d 1014, 1028 (11th Cir. 2001). Plaintiff has failed to establish any of these elements.

With respect to the objective component, prison conditions constitute cruel and unusual punishment only when they result in the

---

18 As a result of this incident, Plaintiff was charged with violating prison rule number 29, assault on a person associated with the Alabama Department of Corrections. Following a disciplinary hearing, Plaintiff was found guilty and sentenced to forty-five days disciplinary segregation and forty-five days loss of privileges. (Doc. 64, att. 11 at 24-25).

"unquestioned and serious deprivation of basic human needs."
Rhodes, 452 U.S. at 347.  The law is clear that "the Constitution
does not mandate comfortable prisons."  Rhodes, 452 U.S. at 349.
"[R]outine discomfort is part of the penalty that criminal offenders
pay for their offenses against society[.]"  Hudson, 503 U.S. at 9
(citations and internal quotation marks omitted).  All that is
required is that prison officials "ensure that inmates receive
adequate food, clothing, shelter, and medical care, and . . . 'take
reasonable measures to guarantee the safety of the inmates[.]'"
Farmer, 511 U.S. at 832 (citations omitted).

     With respect to the subjective component of Plaintiff's Eighth
Amendment claim, "[w]hen the conduct in question involves any measure
taken to prevent a security threat or restore official control, the
Eighth Amendment inquiry is 'whether force was applied in a good faith
effort to maintain or restore discipline or inflicted maliciously
or sadistically for the very purpose of causing harm.'"  Sims, 25
F.3d at 984 (quoting Hudson, 503 U.S. at 6).

     In this case, Defendants maintain that the strip cell procedure
is a security measure used for inmates who throw fluids on staff or
other inmates.  (Doc. 64, att. 1 at 2-3).  According to Assistant
Warden Bishop, the substance typically thrown by inmates "is a
mixture of urine and feces," which the administration considers a
serious health and safety threat to the staff that must work in the

segregation unit with the inmates.[19] (Id.). According to Bishop, when inmates exhibit this type of behavior, the correctional officers remove any items from the cell that could be used to hold such substances. (Id.). This includes bedding and clothing, with the exception of underwear and a towel. (Id.). The property is then slowly returned to the inmate over a period of days, as the inmate demonstrates his willingness to cooperate. (Id.). Defendant Culliver further testified that the water in the cell is turned off and on at two hour intervals or as needed to flush the toilet. (Doc. 204, att. 1 at 3-4).

Assuming Plaintiff's allegations as true, he was deprived of his personal property, mattress, sheets, clothing (except underwear), blanket, soap, towel, washcloth, toilet tissue, and running water for fourteen days because he threw a liquid substance from inside his cell onto the officers and the nurse who were delivering his medication. (Doc. 1 at 11-12). While, unquestionably, Plaintiff's confinement in the strip cell for fourteen days was unpleasant and uncomfortable, Plaintiff has not shown that he was denied adequate food, clothing, shelter, or medical

_____

19 It appears that the liquid thrown by Plaintiff on March 11, 2008, was mouthwash. (Doc. 208 at 19; Doc. 64, att. 11 at 15). However, one month earlier, Plaintiff had a filled a bottle with feces and sprayed it on another individual. It is unclear from the record whether the victim was an officer or another inmate. (Doc. 220, att. 7 at 19).

care during his confinement in the strip cell, nor has he shown that he suffered any injury from his strip cell confinement. Moreover, Plaintiff has not shown that his confinement in the strip cell was malicious and sadistic and for the very purpose of causing harm.

To the contrary, in addition to being provided adequate food, clothing, shelter, and medical care while he was in the strip cell, Plaintiff was provided paper and a pen, which he used to write letters to the Warden complaining that his mail was not being handled properly, that Officer Broadhead had taken his religious property during a previous cell search, that Officer Broadhead had choked him in the elevator, and that he feared harm from officers on other shifts as well. (Doc. 212, att. 1 at 5-6). While Plaintiff also complained to the Warden that he was cold because he did not have a blanket or clothing, his medical records show that, throughout his fourteen-day confinement in the strip cell, he was treated by the prison doctor and nurse for various complaints and ailments relating to the prior cell extraction; however, he never complained to the medical staff about any problem related to his confinement in the strip cell. (Doc. 137, att. 1 at 4-7; Doc. 220, att. 4 at 24; Doc. 212, att. 1 at 40).

The "broad and idealistic concepts" of the Eighth Amendment "must be balanced against competing penological goals." LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993) (quoting Estelle v.

45

Gamble, 429 U.S. 97, 102 (1976) (internal quotation marks omitted)). Prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979).

Because Plaintiff has failed to allege circumstances that would establish a deprivation so grave as to deprive him of the minimal civilized measures of life's necessities, he has failed to meet the objective component of his Eighth Amendment claim. Cf. White v. Marshall, 2008 WL 4826283, *3, *8-9 (M.D. Ala. 2008) (unpublished) (plaintiff's confinement in a strip cell for thirty days with only a drain in the floor for urinating, no clothing except for a paper gown, no mattress for twenty-four days, and no blanket was not a deprivation of "the minimal civilized measure of life's necessities."); Mosley v. Bishop, 2009 WL 1564778, *1, *5-6 (S.D. Ala. 2009) (denial of mattress and bed linens for nine days, which forced inmate to sleep on a "cold, raw steel slab," did not rise to the level of a deprivation of the minimal civilized measure of life's necessities or of a basic human need.); Brown v. Goodman, 2010 WL 2202515, *5-6 (S.D. Ala. 2010) (confinement in strip cell for eight days where plaintiff had to sleep on the "hard iron bed frame a whole week" and "was very cold day (sic) and every night" did not pose "an

46

unreasonable risk of serious damage to his future health or safety.").

Furthermore, because Plaintiff has failed to allege circumstances that would establish that his strip cell confinement for fourteen days was malicious, sadistic, and engaged in for the purpose of causing harm, he has failed to meet the subjective component of his Eighth Amendment claim as well.  Accordingly, Plaintiff has failed to state a constitutional violation based upon his fourteen-day confinement in a strip cell, and Defendants Culliver, Bishop, Jenkins, Ashworth, Watson, Corbitt, McCrory, Stanton, Brazile, Sizemore, Branch, and Brandon Carroll are entitled to summary judgment on this claim.

D. Supervisory Claims.

In the Complaint, Plaintiff alleges that Warden Culliver is liable for his officers' use of excessive force related to the cell extraction and the handcuffs incident.  (Doc. 1 at 19-20).  Having found that Plaintiff's allegations of excessive force related to the physical force that he sustained during the cell extraction, *i.e.*, the beating, and the handcuffs incident fail to establish a constitutional violation, Plaintiff's supervisory claims against Warden Culliver based on those alleged acts of excessive force fail as a matter of law.  See Long v. Slaton, 508 F.3d 576, 583 n.10 (11th Cir. 2007) ("Because Plaintiffs have failed to state a claim for the

violation of a constitutional right, Plaintiffs' supervisory claims
. . . also fail.").

With respect to Plaintiff's allegations that Warden Culliver
is responsible for his officers' use of excessive force related to
their use of the stun shield during the cell extraction, the Court
has found that summary judgment is precluded on the stun shield aspect
of Plaintiff's excessive force claim because of a conflict in the
evidence regarding whether a second shock was delivered and, if so,
whether the second shock was necessary to restrain the Plaintiff.
Therefore, the Court will consider Plaintiff's supervisory claim
against Warden Culliver arising out of that alleged use of excessive
force.

The law is clear that a supervisor "cannot be held liable for
the acts of employees solely on the basis of respondeat superior."
Fundiller v. City of Cooper City, 777 F.2d 1436, 1443 (11th Cir.
1985). "Instead, supervisory liability under § 1983 occurs either
when the supervisor personally participates in the alleged
unconstitutional conduct or when there is a causal connection between
the actions of a supervising official and the alleged constitutional
deprivation." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir.
2003). "The necessary causal connection can be established 'when
a history of widespread abuse puts the responsible supervisor on
notice of the need to correct the alleged deprivation, and he fails

to do so.'" Id. (citations omitted). "Alternatively, the causal connection may be established when a supervisor's 'custom or policy . . . result[s] in deliberate indifference to constitutional rights' or when facts support 'an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" Id. (citations and internal quotation marks omitted).

In this case, the evidence shows that Warden Culliver ordered the cell extraction after it was reported to him that Plaintiff adamantly refused to leave his cell, despite being ordered repeatedly to do so. (Doc. 129, att. 1 at 2). As the Court has already found, the decision to conduct the cell extraction was reasonable under the circumstances.

Other than the initial decision to order the cell extraction, there is no evidence that Warden Culliver personally participated in the cell extraction, nor is there any evidence of a history of widespread abuse related to cell extractions, the use of stun shields, or of a custom or policy of Warden Culliver's that resulted in the alleged use of excessive force in this case. Therefore, because Plaintiff has failed to establish an affirmative causal connection between Defendant Culliver's actions, orders, customs, or policies and any alleged deprivation of Plaintiff's constitutional rights, Defendant Culliver is entitled to summary

judgment on Plaintiff's Eighth Amendment excessive force claims in their entirety.

With respect to Assistant Warden Bishop, Plaintiff's sole claim is that Bishop violated his Eighth Amendment rights by placing him in a strip cell. (Doc. 1 at 21). Having found no constitutional violation arising out of Plaintiff's confinement in the strip cell, Defendant Bishop, and indeed all of the Defendants, are entitled to summary judgment on this claim, as discussed above. In addition thereto, the Court has found no evidence that Defendant Bishop was personally involved in, or in any way connected to, Plaintiff's confinement in the strip cell, whether as a supervisor or otherwise. See Cottone, 326 F.3d at 1360. Therefore, Defendant Bishop is entitled to summary judgment on this claim for this reason as well.

E. State Law Claims for Assault and Battery.

In his Complaint, Plaintiff alleges that Defendants Culliver, Watson, Sizemore, Jenkins, Ashworth, Corbitt, McCrory, Stanton, Brazile, Branch, Brandon Carroll, and Broadhead are liable for state law assault and battery arising out of the incidents of excessive force alleged in the Complaint. (Doc. 1 at 19-44). In Alabama, assault and battery is defined as, "[a]n intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the

50

apparent present ability to effectuate the attempt, if not
prevented." O'Rear v. B.H., 69 So. 3d 106, 117 (Ala. 2011)
(citations and internal quotation marks omitted). "A successful
assault becomes a battery, which consists of the touching of another
in a hostile manner." Id. (citations omitted).

With respect to Plaintiff's state law claims against Defendants
in their official capacities, Eleventh Amendment immunity bars these
claims. See Thorne v. Chairperson Florida Parole Comm'n, 427 Fed.
Appx. 765, 769 (11th Cir. 2011) (unpublished)[20] ("The Eleventh
Amendment bars state-law claims against a state in federal court.
. . . Suits against a state officer in his or her official capacity
are considered to be suits against the state."); Garcia v. Givens,
2011 WL 679439, *3 (N.D. Fla. 2011) (Eleventh Amendment immunity
barred Plaintiff's assault and battery claims against state prison
officials in their official capacities.).

With regard to Plaintiff's state law assault and battery claims
against Defendants in their individual capacities:

> In Alabama, law enforcement officers may invoke
> statutory immunity from civil suit for the
> "performance of any discretionary function
> within the line and scope of his or her law
> enforcement duties." Ala. Code § 6-5-338.
> Acts performed within an officer's
> discretionary function are those "as to which

---

[20] "Pursuant to Eleventh Circuit Rule 36-2, unpublished opinions are
not considered binding precedent, but may be cited as persuasive
authority." Lanier Constr., Inc. v. Carbone Props. of Mobile, LLC,
253 Fed. Appx. 861, 865 n.5 (11th Cir. 2007) (unpublished).

> there is no hard and fast rule as to the course
> of conduct that one must or must not take and
> those acts requiring exercise in judgment and
> choice and involving what is just and proper
> under the circumstances." <u>Sheth v. Webster</u>,
> 145 F.3d 1231, 1239 (11th Cir. 1998) (per
> curiam) (internal quotation mark omitted).
> "[A] court first determines whether the
> government defendant was performing a
> discretionary function when the alleged wrong
> occurred; if so, the burden shifts to the
> plaintiff to demonstrate that the defendant [
> ] acted in bad faith, with malice or
> willfulness...." <u>Scarbrough v. Myles</u>, 245
> F.3d 1299, 1303 n.9 (11th Cir. 2001) (per
> curiam) (alteration in original) (internal
> quotation mark omitted).

<u>Lawrence v. City of Fairhope, Ala.</u>, 429 Fed. Appx. 900, 904 (11th Cir. 2011).  Moreover, in <u>Ex parte Cranman</u>, 792 So. 2d 392, 405 (Ala. 2000), the Alabama Supreme Court restated the rule governing state-agent immunity and held that, notwithstanding the general rule that a state agent "*shall* be immune from civil liability" when acting within his discretionary functions, "a State agent *shall not* be immune from civil liability in his or her personal capacity . . . when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.") (emphasis in original).

Considering, first, Plaintiff's allegations of assault and battery against Defendant Broadhead related to the choking incident in the elevator, the evidence is clear that Officer Broadhead was acting in his capacity as a state law enforcement officer and was

exercising his judgment and discretion in that capacity when this confrontation occurred.  See Ex parte Dixon, 55 So. 3d 1171, 1177-78 (Ala. 2010)(prison guards are "law enforcement officers" and, thus, are protected by state-agent immunity under § 6-5-338 and Cranman.).  Therefore, the burden shifts to Plaintiff to demonstrate that Officer Broadhead acted in bad faith, willfully, maliciously, fraudulently, or beyond his authority.  Lawrence, 429 Fed. Appx. at 904.

As discussed above, after creating a disturbance in sick call screening, Plaintiff confronted Officer Broadhead in the elevator, accusing Broadhead of taking his personal property.  In response to this confrontation, Officer Broadhead choked Plaintiff.  (Doc. 1 at 5).  Even viewing the evidence in a light most favorable to Plaintiff, the fact remains that Officer Broadhead was forced to quickly respond to a reasonably perceived threat from an angry inmate in an elevator.  Although the use of force was unorthodox, under the circumstances it was not willful, malicious, fraudulent, in bad faith, or beyond Officer Broadhead's authority.[21]  Therefore, Defendant Broadhead is entitled to state-agent immunity on Plaintiff's assault and battery claims.

Plaintiff also asserts state law assault and battery claims against Defendants Watson and Sizemore related to the cell extraction.  (Doc. 1 at 25, 40).  However, as discussed above, the

---

21 The fact that the force left no mark, scratch, or injury of any kind further indicates that it was not willful or malicious.

evidence is clear that neither Watson nor Sizemore was involved in the cell extraction.  (Doc. 64, att. 13 at 1; Doc. 64, att. 7 at 3). Similarly, Plaintiff asserts state law assault and battery claims against Defendant Culliver related to the cell extraction and the handcuffs incident with Officer Corbitt.  (Doc. 1 at 19-20). However, again, there is no evidence that Defendant Culliver was personally involved in these events, nor is there evidence that, as a supervisor, he was causally connected through his customs or policies to these alleged acts of excessive force.  Therefore, Defendants Watson, Sizemore, and Culliver are entitled to summary judgment on Plaintiff's state law assault and battery claims for lack of evidence of causation.

Finally, with respect to Plaintiff's assault and battery claims against Defendants Jenkins, Ashworth, McCrory, Stanton, Brazile, Branch, Brandon Carroll, and Corbitt related to the cell extraction, the evidence shows that these Defendants were acting in their capacities as law enforcement officers and were performing discretionary functions when they conducted the cell extraction. Therefore, the burden shifts to Plaintiff to show that they acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

The Court has previously found in this case that the decision to conduct the cell extraction was reasonable, given that Defendants

were charged with the task of forcibly removing a hostile and uncooperative inmate from his cell. The Court also previously found that, with the exception of the stun shield, the physical force used by Defendants was minimal and, thus, did not violate the Eighth Amendment. See Hudson, 503 U.S. at 8-10 ("[N]ot . . . every malevolent touch by a prison guard gives rise to a federal cause of action. . . . The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.") (citations and internal quotation marks omitted).

Unlike the force necessary to establish an Eighth Amendment claim, however, a mere touch "conducted in a harmful or offensive manner" can establish a state law assault and battery claim. See Harper v. Winston County, 892 So. 2d 346, 353 (Ala. 2004) ("The plaintiff in an action alleging assault and battery must prove (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner.") (citations and internal quotations marks omitted). Whether Defendants are entitled to state-agent immunity for this claim rests on whether Defendants acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority with respect to the physical force used during the cell

extraction, matters which are in dispute in this case. Therefore, Defendants are not entitled to state-agent immunity on Plaintiff's assault and battery claims arising out of Defendants' use of physical force during the cell extraction.

Similarly, with respect to the use of the stun shield, the Court has previously found in relation to Plaintiff's Eighth Amendment excessive force claim that there is a dispute of fact as to whether a second shock was administered and, if so, whether it was necessary to restrain Plaintiff or was done maliciously and sadistically to cause harm. This conflict in the evidence likewise precludes the application of state-agent immunity. Thus, Defendants Jenkins, Ashworth, McCrory, Stanton, Brazile, Branch, Brandon Carroll, and Corbitt are not entitled to state-agent immunity or summary judgment on Plaintiff's assault and battery claims arising out of the use of physical force or the use of the stun shield during the cell extraction.

## V.  CONCLUSION

Based on the foregoing, the Court recommends that Defendants' motions for summary judgment (Docs. 63, 64, 104, 105, 128, 129, 135, 136, 151, 159, 160, 171, 172, 204, 220, 224, 227), be granted in part and denied in part as follows:

1) The motions for summary judgment of Defendants Culliver, Bishop, Watson, Sizemore, Broadhead, Burroughs, Portis, and

Nurse Sara Carroll are due to be granted with respect to all claims asserted against them by Plaintiff in the Complaint, and Plaintiff's action against these Defendants is due to be dismissed with prejudice;

2) The motions for summary judgment of Defendants Jenkins, Ashworth, McCrory, Stanton, Brazile, Branch, Brandon Carroll, and Corbitt are due to be granted with respect to all claims asserted against them by Plaintiff in the Complaint, *except for the following:*

   a. The motions for summary judgment of Defendants Jenkins, Ashworth, McCrory, Stanton, Brazile, Branch, Brandon Carroll, and Corbitt are due to be denied with respect to Plaintiff's Eighth Amendment excessive force claim based on the use of the stun shield during the cell extraction; and

   b. The motions for summary judgment of Defendants Jenkins, Ashworth, McCrory, Stanton, Brazile, Branch, Brandon Carroll, and Corbitt are due to be denied with respect to Plaintiff's state law assault and battery claims arising out of Defendants' use of physical force and the use of the stun shield during the cell extraction.

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND
RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND
FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.   *Objection*.   Any party who objects to this recommendation or
anything in it must, within fourteen (14) days of the date of service
of this document, file specific written objections with the Clerk
of this court.   Failure to do so will bar a *de novo* determination
by the district judge of anything in the recommendation and will bar
an attack, on appeal, of the factual findings of the Magistrate Judge.
*See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th
Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B,
1982) (*en banc*).   The procedure for challenging the findings and
recommendations of the Magistrate Judge is set out in more detail
in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a
> magistrate judge in a dispositive matter, that is, a matter
> excepted by 28 U.S.C. § 636(b)(1)(A), by filing a
> 'Statement of Objection to Magistrate Judge's
> Recommendation' within ten days[22] after being served with
> a copy of the recommendation, unless a different time is
> established by order.   The statement of objection shall
> specify those portions of the recommendation to which
> objection is made and the basis for the objection.   The
> objecting party shall submit to the district judge, at the
> time of filing the objection, a brief setting forth the
> party's arguments that the magistrate judge's
> recommendation should be reviewed *de novo* and a different
> disposition made.   It is insufficient to submit only a
> copy of the original brief submitted to the magistrate
> judge, although a copy of the original brief may be
> submitted or referred to and incorporated into the brief
> in support of the objection.   Failure to submit a brief
> in support of the objection may be deemed an abandonment
> of the objection.

A magistrate judge's recommendation cannot be appealed to a
Court of Appeals; only the district judge's order or judgment can
be appealed.

2.   *Transcript (applicable Where Proceedings Tape Recorded).*

---

[22] Effective December 1, 2009, the time for filing written objections
was extended to "14 days after being served with a copy of the
recommended disposition[.]"   <u>Fed. R. Civ. P.</u> 72(b)(2).

Pursuant to 28 U.S.C. § 1915 and FED. R. CIV. P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

DONE this 14th day of November, 2011.

s/BERT W. MILLING, JR.
UNITED STATES MAGISTRATE JUDGE